NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0327n.06

Case No. 23-5791

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>

DAVID BELL; CINDY WILDER BELL,

    Plaintiffs-Appellants,

v.

KOKOSING INDUSTRIAL, INC., et al.,

    Defendants-Appellees.

</td><td>

)
)
)
)
)
)
)
)
)
)

</td><td>

**FILED**
Jul 26, 2024
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF KENTUCKY


O P I N I O N

</td></tr>
</table>

Before: MOORE, McKEAGUE, and GRIFFIN, Circuit Judges.

McKEAGUE, J., delivered the opinion of the court in which GRIFFIN, J., joined in full. MOORE, J. (pp. 27–29), delivered a separate opinion concurring in part and dissenting in part.

**McKEAGUE, Circuit Judge.** Cindy and David Bell wanted to turn a sloped, uninhabitable piece of their Kentucky property along the Ohio River into an organic garden and retreat for fellow church members. They agreed to let Kokosing Industrial dump clean fill from a Cincinnati sewer project onto their land to help them do so. Some of the fill, however, turned out to be contaminated. Kokosing spent over $1.6 million to clean up the dirty fill. Still, the Bells sued, alleging various claims. Following a bench trial, they succeeded on only one and received nominal damages. The Bells appeal. We affirm.

**I.**

Sewers on Cincinnati's west side were overflowing. To prevent future overflow, the City needed to separate its sanitary waste from its storm water. Its Metropolitan Sewer District, known as MSD, designed the "Lick Run Project" to make that change.

**A.**

One of the first things on the Lick Run Project's to-do list was to assess whether any of the project's land was contaminated. Relevant here, MSD hired ATC Group Services, LLC to closely assess the area known as Site 20—a McDonald's restaurant. A different company had flagged that site as having "fill materials . . . of unknown origin." Findings of Fact and Conclusions of Law (Findings), R.173 at PageID 6333 ¶ 14 (omission in original). ATC used non-invasive techniques to assess Site 20 because McDonald's prohibited more intrusive testing. ATC reported regions of unusual electromagnetic responses in the site's driveway, which suggested potential industrial backfill. The site otherwise lacked electromagnetic anomalies.

MSD then hired Strand Associates to draw a map based on ATC's report. The map classified the soil throughout the Lick Run Project by type. "Type 1" soil had no "quantified [chemicals of concern] at concentrations in excess of [applicable or relevant and appropriate requirements] for unrestricted land use." *Id.* at 6331 ¶ 10; Project Specifications, R.110-3 at PageID 3507. Put simply, Type 1 soil was "non-contaminated." Findings, R.173 at PageID 6331 ¶ 10; Project Specifications, R.110-3 at PageID 3507. But soil classified as Types 2, 3, or 4 *was* contaminated to varying degrees. As for Site 20, the map labeled its driveway as Type 2 and the rest Type 1.

**B.**

With a lay of the land in hand, MSD moved on to picking the project's general contractor. It did so through a formal bidding process. Along with a description of what the Lick Run Project entailed, MSD provided potential bidders with ATC's report and Strand Associates's map. Kokosing Industrial ultimately won the bid.

2

A construction contract governed Kokosing's work. Some of its terms reinforced information Kokosing already knew. For example, Section 3.10(A) said that "[a]reas of contaminated soil are identified" as Types 2, 3, and 4 on Strand Associates's map. Construction Contract, R.13-2 at PageID 658; Findings, R.173 at PageID 6332 ¶ 13. Other terms, like Section 1.04(E), provided Kokosing new information. There, the contract clarified that Kokosing must "assume that all excavated material" is uncontaminated. Construction Contract, R.13-2 at PageID 646; Findings, R.173 at PageID 6332 ¶ 13. But if Kokosing came across soil that appeared to be contaminated, it needed to stop work and notify ATC and MSD.

Kokosing was mindful of the differences in soil. Before excavating, it had the project's land surveyed and marked according to Strand Associates's map. That way, Kokosing would know where each soil type started and ended.

Kokosing was almost ready to start excavation. It just needed two more things: (1) someone to haul dirt from the sites and (2) somewhere to put the dirt. Ashcraft Sand & Gravel thought it could deliver on both accounts. It was interested in hauling dirt for the Lick Run Project and had a dump site in mind.

Enter Cindy and David Bell. The Bells lived on just under an acre of land in northern Kentucky. But part of that acre was uninhabitable; the property's northern edge sloped into the Ohio River's floodplain. The Bells wanted to change that. They sought to elevate and level that piece of property to create a greenhouse, an organic garden, and a camping area for their church friends. To that end, they had accepted fill for over a decade. Some of the fill came from one of Ashcraft's drivers. Ashcraft thought Kokosing could use the Bells' property for fill from the project. It proposed that option to Kokosing and got the job.

Kokosing then coordinated with the Bells. It first confirmed that they still wanted fill dirt. After that, the parties executed a waste agreement.[1] That agreement provided Kokosing "the right to deposit waste material" on the Bells' property. Waste Agreement, R.110-50 at PageID 3714. But those materials could "not contain any contaminants as defined by state and/or federal law." *Id.*; Findings, R.173 at PageID 6334 ¶ 21. The waste agreement also contained an indemnification clause. Per its terms, Kokosing agreed to cover, among other things, the Bells' "reasonable attorneys' fees and any other costs of litigation . . . arising out of injuries to persons . . . or damage to property caused by [Kokosing] . . . or in any way attributable to the performance" of the agreement. Waste Agreement, R.110-50 at PageID 3716. The Bells allege in their amended complaint that the City approved the waste agreement.

## C.

Excavation of Site 20 began on September 6, 2017. Kokosing first removed the soil labeled as "Type 2" on Strand Associates's map. It took about three days to clear out. Following protocol, Ashcraft hauled all the Type 2 soil to a landfill.

On October 2, 2017, Kokosing turned to Site 20's Type 1 soil. Ashcraft delivered that soil to the Bells' property. But, before long, the Bells sensed that something was off. They noticed that the soil was black and smelled like gas and burnt coal. They contacted Kokosing, who assured them they didn't need to worry—the dirt complied with the waste agreement.

---

[1] Several of the waste agreement's terms are crossed out. *See* Waste Agreement, R.110-50 at PageID 3715–16. It is unclear what effect those cross-outs have on the contract. For purposes of this appeal, however, the parties agree that we should treat those terms as if they are not part of the contract. We therefore focus on only the provisions that remain.

Nine days later, Kokosing employees also raised concerns about the soil. While excavating dirt on Site 20, they came across a black, oozy liquid that smelled like oil. They stopped digging and called a representative from MSD. The representative reviewed the liquid and told Kokosing to stockpile any wet soil but continue to treat dry material as Type 1 soil.

The next day, October 12, representatives from ATC visited Site 20. They took samples of both the dry soil—which Kokosing continued to excavate—and the stockpiled soil.

The Kentucky Department for Environmental Protection, KDEP for short, took an interest in the soil too. On October 13, representatives from the department went to the Bells' property and asked if Site 20's soil had been tested. Mr. Bell confirmed that it had. But the department wanted more specifics. So Mr. Bell called Kokosing and asked for ATC's contact information. Kokosing responded within two hours.

Over the next week, test results for the soil samples trickled in. At first, they suggested that the soil was clean. So Kokosing pressed on with excavation and had Ashcraft haul dirt to the Bells' property. Later results brought bad news. On October 17, 2017, ATC told Kokosing and MSD that the samples were positive for lead-based contaminants. Kokosing then ordered all excavation and dirt hauling at Site 20 to stop. Still, two days later, Ashcraft dumped 68 more truckloads of dirt on the Bells' property. In total, the Bells' property received 2,057 truckloads of dirt.

Despite test results showing contamination, how to classify Site 20's soil remained an open question. On October 19, ATC told Kokosing that they "dodged a bullet" and that the soil might be considered Type 1A or 1B. Findings, R.173 at PageID 6341 ¶ 48. Those classifications would mean that the soil was contaminated, but not as much as Type 2 soil. Similarly, a few weeks later, MSD told Kokosing that the soil might be Type 2, but "when characterized via composite

sampling/analysis, data supports Type 1 classification." *Id.* at 6341 ¶ 49. Kokosing relayed that information to the Bells, informing them that ATC and MSD continued to classify the soil as Type 1.

In November, the City started showing up in Kentucky. Two of MSD's senior engineers drove to the Bells' property. While there, they took photographs and videos. By the end of the month, Mr. Bell was in direct contact with the City's engineer.

KDEP appeared next at the Bells' property in December. The department came to get some soil samples. After testing, KDEP determined that the property was contaminated with polyaromatic hydrocarbons. KDEP issued Notices of Violation to Ashcraft, the Bells, Kokosing, and MSD.

### D.

Kokosing quickly agreed to fix the Bells' property. It hired ATC to help it brainstorm the best way to do so. ATC closely evaluated the issue and noticed that the fill from Site 20 wasn't the only source of contamination. Some of the property's preexisting fill also contained polyaromatic hydrocarbons. So ATC recommended two things: (1) removing all fill that came from Site 20 and (2) placing an environmental covenant over the piece of property with preexisting contamination. As to the latter, the covenant would effectively prohibit only residential uses. Non-habitable buildings and things like camping and picnicking would all be fair game. KDEP approved that plan, with minor modifications, in July 2019.

But before remediation could begin, the Bells wanted more. They demanded that Kokosing build them an access road, create a golf cart path, revise the grading plan, add extra topsoil, hydroseed, and provide $6,000 for trees. Kokosing accepted each of the Bells' requests. And in

July 2020, the parties entered an agreement to that effect. Seven months later, Kokosing completed its remediation efforts. In total, remediation cost Kokosing over $1.6 million.

**E.**

While Kokosing and ATC were still creating a remediation plan, the Bells sued Ashcraft, ATC, the City of Cincinnati, Kokosing, and MSD. Their amended complaint alleged fourteen counts. In the years to come, the number of defendants and the claims against them progressively decreased.

The first big cut came at the pleadings stage. Some defendants, like Ashcraft and Kokosing, argued that the Bells failed to state a claim. Others, like ATC and the City, said the district court lacked personal jurisdiction over them. With its motion to dismiss, the City included a declaration stating that (1) the City's performance of the Lick Run Project took place only in Ohio, and (2) before learning that Kokosing dumped fill on the Bells' property, "the City had no contacts with Kentucky." Arnette Decl., R.13-2 at PageID 148. The district court granted all the defendants' motions in full except for Kokosing's, which it granted in part. Four claims against Kokosing were left: (1) breach of contract, (2) negligence per se, (3) fraudulent misrepresentation, and (4) intentional trespass.

But those decreased too. In July 2021, the Bells and Kokosing cross-moved for summary judgment. The district court granted each motion in part. It held that Kokosing was entitled to judgment on the Bells' claim for negligence per se. The court also ruled for the Bells on their breach of contract claim, but only concerning the existence of a contract and breach—not damages. So the only remaining questions for trial were whether the Bells suffered damages and whether Kokosing was liable for fraudulent misrepresentation and intentional trespass.

7

After a three-day bench trial, the district court ruled on those questions. *First*, the court held that Kokosing was not liable for damages on the Bells' breach of contract claim. In so ruling, the court credited Kokosing's expert, Christy Brunk, who testified that the Bells' property value—following Kokosing's remediation—had increased. Though Mr. Bell testified otherwise, the district court did not find his testimony persuasive. *Second*, the district court determined that Kokosing was not liable for fraudulent misrepresentation because it never intended to defraud the Bells. *Finally*, the district court determined that Kokosing was liable for intentional trespass. Its holding, however, was narrow. Kokosing's liability covered only the 68 loads of dirt dumped on October 19. Even then, the district court awarded only nominal damages.

The Bells timely appealed.

## II.

The Bells raise at least five errors for our review.[2] One concerns the district court's ruling on a motion to dismiss for lack of personal jurisdiction. The others involve the district court's findings of fact and conclusions of law. We address each error in turn, applying Kentucky substantive law because this case is based on diversity jurisdiction. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

### A.      Personal Jurisdiction Over the City

We begin with the district court's alleged jurisdictional blunder. The Bells claim that the court erred in holding that it lacked personal jurisdiction over the City of Cincinnati. The Court

---

[2]  As Ashcraft and MSD correctly observe, none of the issues involve them. So any potential challenge the Bells might have had to a ruling in Ashcraft or MSD's favor is forfeited. *Cent. Ohio Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 762 F.3d 483, 490 (6th Cir. 2014).

reviews determinations of personal jurisdiction de novo. *Bridgeport Music, Inc. v. Still N The Water Pub'g*, 327 F.3d 472, 477 (6th Cir. 2003) (per curiam). Having done so, we see no error.

The Bells bore the burden of showing personal jurisdiction. *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007). Because this is a diversity suit, they needed to demonstrate that the forum state could have exercised personal jurisdiction over the City. *Blessing v. Chandrasekhar*, 988 F.3d 889, 901 (6th Cir. 2021). The forum state here—Kentucky—recently amended its long-arm statute. Ky. Rev. Stat. § 454.210. But that amendment does not appear to be retroactive. After all, it doesn't say that it is. *See id.* § 446.080(3) ("No statute shall be construed to be retroactive, unless expressly so declared."). Accordingly, we apply the long-arm statute that was in effect at the time of filing, which requires us to follow a two-step process for determining personal jurisdiction. *Blessing*, 988 F.3d at 901 (citing *Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51, 57 (Ky. 2011)). We must first assess whether the cause of action arises from conduct covered by Kentucky's long-arm statute. *Id.* If so, we then consider whether exercising personal jurisdiction comports with federal due process. *Id.*

The Bells fail at step one. Kentucky's long-arm statute covers nine categories of conduct. Ky. Rev. Stat. § 454.210(2)(a) (amended 2024). And it requires the Bells' claims to "aris[e] from" that conduct. *Id.* § 454.210(2)(b); *Caesars*, 336 S.W.3d at 58–59. The Bells argue only under the statute's first category, which applies if the City *transacted business* in Kentucky. *Id.* § 454.210(2)(a)(1). But they haven't alleged actions by the City that meet the long-arm statute's requirements.

In trying to carry their burden, the Bells first direct us to actions taken by the City starting in November 2017. Specifically, the Bells allege that city engineers came to their property in November and December 2017 and that one emailed Mr. Bell after the November visit. They also

9

say that the City attended a KDEP meeting in January 2018 and later helped with remediation efforts. In doing so, however, the Bells overlook that their claims stem from Kokosing's dumping of contaminated soil on their property. And the alleged transactions that they cite *post-date* Kokosing's dumping. The Bells thus have not shown a "reasonable and direct nexus between the conduct that caused [their] injury, and [the City's] business activities in Kentucky." *Caesars*, 336 S.W.3d at 59 (emphasis omitted). So the district court was right to hold that it lacked personal jurisdiction under Kentucky's long-arm statute based on these actions.

The Bells next direct us to actions that they believe show that the City contributed to the dumping, which, in theory, overcomes the above timing issue. For example, the Bells allege in their amended complaint that the City approved the waste agreement. But these actions don't get the Bells any further. Regardless of whether they could satisfy the requisite minimum contacts under federal due process, the Bells have not explained how these actions, taken in Ohio, constitute transacting business in Kentucky. *Compare Clark v. Kolbell*, No. 2014-CA-000747-MR, 2016 WL 304625, at *4 (Ky. Ct. App. Jan. 22, 2016) (holding that a doctor's reviewing of a Kentucky patient's medical records in Oregon did not constitute transacting business in Kentucky, because the doctor was "two steps removed from" the company that directly contracted in the Commonwealth), *and Lycom Commc'ns, Inc. v. Don & Mary Rice, Inc.*, No. 2018-CA-000148-MR, 2019 WL 2246606, at *3 (Ky. Ct. App. May 24, 2019) (technology company's sales of software to intermediary company did not constitute transacting business in Kentucky despite intermediary selling software in Kentucky), *with Am. Trade All., Inc. v. S. Cross Trading, Inc.*, No. 2009-CA-001353-MR, 2011 WL 112439, at *2 (Ky. Ct. App. Jan. 14, 2011) ("The active promotion of the sales of its products to Kentucky residents indicates the intent to invoke the benefits and protections of this jurisdiction and constitutes the 'transaction of any business' in this

state."). Even if the City's actions performed in Ohio had an effect in Kentucky, the Bells have not explained how such actions could reasonably be considered transacting business *in* Kentucky. *See, e.g.*, *H.E.B., LLC v. Jackson Walker, L.L.P.*, 587 S.W.3d 333, 341 (Ky. Ct. App. 2019) (explaining that classic examples of transacting business include "[m]aking telephone calls, texting, entering into contract negotiations, sending letters, and emailing"). The Bells thus fail to demonstrate that the district court possessed jurisdiction over the City of Cincinnati.

## B.    Claims Against Kokosing

The remaining issues on appeal involve the district court's findings of fact and conclusions of law. We review findings of fact for clear error. *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 517 (6th Cir. 2009) (per curiam). If those findings involved credibility determinations, we afford them "great deference." *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 547 (6th Cir. 2010) (citation omitted). Conclusions of law are reviewed de novo. *Hance*, 571 F.3d at 517.

The Bells disagree with the district court's resolution of all their claims at trial: (1) breach of contract, (2) fraudulent misrepresentation, and (3) intentional trespass. We consider the Bells' challenges in order.

### 1.    Breach of Contract

The Bells spend nearly half of their opening brief contesting how the district court resolved their breach of contract claim. But distilled to their core, those pages raise only two questions[3]: Did the Bells suffer damages, and were they entitled to indemnification?

---

[3] The Bells also raise one other issue, but it can be disposed of quickly. Specifically, they fault the district court for equating Type 1 soil with material that would comply with the waste agreement. That finding was not an error. Properly classified, Type 1 soil is "non-contaminated." Findings, R.173 at PageID 6331 ¶ 10; Project Specifications, R.110-3 at PageID 3507. And the waste agreement required fill that did "not contain any contaminants as defined by state and/or

### a.    Damages

At summary judgment, the district court held that the Bells had shown breach. But they also needed to prove damages to prevail. *See Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. Ct. App. 2007) (stating that a plaintiff must prove damages, not just the existence of a contract and breach). Kentucky law defines contract damages as "that sum which will put the injured party into the same position he would have been in had the contract been performed." *Hogan v. Long*, 922 S.W.2d 368, 371 (Ky. 1995) (citation omitted).

The Bells offer two theories to show that the district court erred in finding that they did not suffer damages. Neither succeed.

### i.

The Bells first contend that they are entitled to damages equal to the "dollar value of the undelivered number of cubic yards of uncontaminated fill needed to create a level lot out of the floodplain." Reply Br. 4. The Bells insist that if the Kokosing did not breach the contract, they would now have a level, one-acre property rising out of the Ohio River's floodplain. After remediation, however, their property was separated into three levels. So the Bells seek damages to account for that variance.

But their argument relies on a mistaken assumption that Kokosing had to deliver a certain amount of soil. The district court rejected that assumption during summary-judgment proceedings, holding that "no breach occurred with respect to the amount of fill delivered." Summ. J. Order, R.98 at PageID 3417. And that ruling was not an error. After all, the waste agreement's only

---

federal law." Findings, R.173 at PageID 6334 ¶ 21; Waste Agreement, R.110-50 at PageID 3715. Those two things are the same.

provision specifying any potential quantity of fill was crossed out. Even if the parties had not crossed out that provision it specified—at best—only a maximum amount of fill that *could* be delivered, not an amount that *had* to be delivered. Further, as the Bells' lawyer conceded during oral argument, the waste agreement did not otherwise contain language requiring Kokosing to provide the Bells with a flat lot. And Kentucky law requires us to interpret unambiguous contracts based on their four corners. *Abney v. Nationwide Mut. Ins.*, 215 S.W.3d 699, 703 (Ky. 2006), *as modified on denial of reh'g* (Mar. 22, 2007). That is especially so here because the contract contains a merger clause stating that the waste agreement "supersedes any prior understandings . . . or oral agreements between the parties." Waste Agreement, R.110-50 at PageID 3717; *see also Lore, LLC v. Moonbow Invs., LLC*, No. 2012-CA-001305-MR, 2014 WL 507382, at *6 (Ky. Ct. App. Feb. 7, 2014). This unsupported theory of damages therefore does not warrant reversal.

**ii.**

The Bells' second theory is that they are entitled to stigma damages. "[S]tigma damages compensate for . . . long-term negative perception[s] of the property" following things like environmental issues. *Muncie v. Wiesemann*, 548 S.W.3d 877, 880 (Ky. 2018) (first alteration in original) (citation omitted). The value of a "negative perception" is, of course, difficult to discern. So in determining whether to award stigma damages, Kentucky courts instead assess "the amount by which a real property's value is diminished in excess of repair costs." *Id.* The question thus is whether the Bells' property decreased in value following Kokosing's breach and remediation. *See id.*

At trial, Mr. Bell testified for the Bells, arguing that the property's value *did* decrease. Before Kokosing's breach, he said the property was worth around $470,000 because a house nearby recently sold for that much. But after Kokosing's breach, Mr. Bell testified that he didn't

think the property "would be worth a lot." Trial Tr., R.166 at PageID at 5800–01. Indeed, Mr. Bell stated that he was hard-pressed to believe that "you would get anybody to agree to buy a contaminated piece of property." *Id.*

The district court, however, ultimately adopted the opinion of Kokosing's expert, Christy Brunk, who testified that the Bells' property value had *increased*. Brunk is an expert in "evaluat[ing] environmental contamination." Trial Tr., R.168 at PageID 6185. Using a math formula, she concluded that the Bells' property value went up from $125,000 to $175,000. Notably, in reaching that conclusion, Brunk opined that the local market did not (1) penalize properties with a history of contamination, or (2) have a stigma against properties with environmental covenants. Relying on Brunk's testimony, the district court held that the Bells had not proven stigma damages.

The district court did not err in finding Brunk more credible and persuasive. Unlike Brunk, Mr. Bell lacked formal training in valuing properties following contamination. He instead had general experience in the real estate industry. To be sure, by no means do we suggest that Mr. Bell wasn't competent or qualified to testify. But the district court could afford his testimony less weight in light of Brunk's expertise and comparable testimony. *See United States v. Persaud*, 866 F.3d 371, 380–81 (6th Cir. 2017) (explaining that the weight and credibility to be given to witness testimony, including expert testimony, is exclusively for the fact finder to determine). Further, the property that Mr. Bell used to appraise the Bells' property possessed "many distinguishable features." Findings, R.173 at PageID 6344 ¶ 65. Meanwhile, Brunk relied on significant data that the district court thought accurately captured the local market's attitude toward contamination and environmental covenants. In sum, the record adequately supports the district court's reliance on

Brunk's testimony. The court thus did not clearly err in finding that the Bells' property did not diminish in value.

The Bells now try to poke holes in Brunk's testimony and its basis to undermine her credibility. Their attempts, however, are misplaced.

*First*, the Bells claim that Brunk erroneously relied on a local appraiser's opinion of the Bells' property's value even though the appraiser admitted that he wasn't qualified to offer an opinion on the value of contaminated property. But the Bells misunderstand the local appraiser's limited role. As Brunk explained on cross-examination, the local appraiser provided Brunk merely with an estimation of the property's "baseline" price, that is, the price without considering things like contamination. Trial Tr., R.168 at PageID 6226. That was the starting point for her mathematical formula used in determining diminution of value. From there, Brunk made all the environmental impact assessments. Accordingly, Brunk did not rely on the appraiser's opinion for an improper purpose.

*Second*, the Bells argue that Brunk erroneously relied on testimony from Kokosing's environmental expert that contradicted some of KDEP's findings. The Bells specifically object to testimony suggesting that Kokosing had removed all the contaminated soil it had dumped on the Bells' property. But the completeness of Kokosing's soil removal did not bear on Brunk's opinion. More important was whether the remediation efforts (no matter what they entailed) were completed and how the property could be used despite prior contamination. So this basis does not undermine Brunk's credibility either.

\*     \*     \*

For these reasons, the district court didn't err in finding that the Bells didn't prove damages.

### b. Indemnification

The Bells next argue that the district court erred in failing to award them over $940,000 in attorney fees and costs. When it comes to attorney fees and costs, "Kentucky has long followed the 'American Rule,'" which requires parties to pay their own way. *Cummings v. Covey*, 229 S.W.3d 59, 61 (Ky. Ct. App. 2007) (citing, among other cases, *Dulworth & Burress Tobacco Warehouse Co. v. Burress*, 369 S.W.2d 129 (Ky. 1963)); *see Rumpel v. Rumpel*, 438 S.W.3d 354, 360 (Ky. 2014). But exceptions to that rule exist—a party might prove that attorney fees are provided for in a statute or a contractual provision. *Seeger v. Lanham*, 542 S.W.3d 286, 295 (Ky. 2018).

The Bells try to use the waste agreement's indemnification clause to carry their burden. That clause states:

> To the exten[t] permitted by law, [Kokosing] agrees to indemnify, save harmless and defend [the Bells] from and against any losses, liabilities, costs, expenses, suits, actions, claims and all other obligations and proceedings whatsoever, including without limitation, all judgments rendered against and all fines and penalties imposed upon [the Bells], and any reasonable attorneys' fees and any other costs of litigation (hereinafter referred to as "liabilities") arising out of injuries to persons, including disease or death, or damage to property caused by [Kokosing], its employees, agents, subcontractor, or in any way attributable to the performance and prosecution of this Agreement, except that [Kokosing's] obligation to indemnify [the Bells] shall not apply to any liabilities arising from [the Bells'] sole negligence, or that portion of any liabilities that arise out of [the Bells'] contributing negligent acts or negligent omissions.

Waste Agreement, R.110-50 at PageID 3716. The question therefore is whether, given the indemnification clause, Kokosing must cover the Bells' attorney fees. Like the district court, we conclude that Kokosing isn't obligated to do so.

16

**i.**

The Bells first seek the attorney fees and costs they incurred in the present litigation against Kokosing. But in doing so, they try to fit a square peg in a round hole.

Consider first what indemnification provisions usually cover. "The classic indemnity situation" involves one party (the indemnitor) agreeing to pay a second party (the indemnitee) "for all the consequences of legal action concerning a third [party]." *E. C. Ernst, Inc. v. Manhattan Const. Co. of Texas*, 551 F.2d 1026, 1038 (5th Cir.), *opinion modified on reh'g*, 559 F.2d 268 (1977); *see Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 798 (6th Cir. 2003) (stating that the "historical scope of usual indemnification provisions" is "indemnity only for third-party claims" but recognizing that contractual language may be broader). Indeed, "[t]he essence of an indemnity agreement is to hold an indemnitee harmless and completely relieved of liability . . . ." 42 C.J.S. Indemnity § 15; *see* 1 Corbin on Contracts Desk Edition § 16.04 ("An agreement of indemnity involves a promise to save another party harmless from losses or liability."). And liability typically comes from a third-party who faced a separate harm at the hands of the indemnitor. *Tony Guiffre Distrib. Co. v. Washington Metro. Area Transit Auth.*, 740 F.2d 295, 298 (4th Cir. 1984).[4]

Contrast those scenarios with what the Bells pursue here. They seek indemnification for attorney fees from a direct claim that they brought against Kokosing—the indemnitor—*not* a third

---

[4] Though the Kentucky Supreme Court hasn't explicitly endorsed these general principles, we haven't found caselaw suggesting that it would stray from them, nor have the Bells provided any. And our job here is to predict how that court, faced with the question, would rule. *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008).

party. Such scenarios are generally not contemplated by indemnity provisions. *Cf. id.*; *E.C. Ernst*, 551 F.2d at 1038.

That's not to say that an indemnity agreement can *never* cover direct claims against an indemnitor. But for an agreement to be given such effect—particularly when the implication of construing the agreement in such a way means shifting attorney fees—it should say so. *See U.S. Fid. & Guar. Co. v. Napier Elec. & Const. Co.*, 571 S.W.2d 644, 646 (Ky. Ct. App. 1978). Indeed, we held in a like case that an indemnitee could not recover attorney fees incurred in a direct action against an indemnitor, explaining that a state court likely would not support such a result. *Warren Drilling Co. v. Equitable Prod. Co.*, 621 F. App'x 800, 805–08 (6th Cir. 2015). As above, we recognized the presumption that the plain language of an indemnity provision "most naturally applie[d] to the expenses incurred . . . in [a] third-party action" rather than "fees and expenses incurred in determining what the [contract there]—and its indemnification clause—means." *Id.* at 806. And the fact that a jurisdiction applies the American Rule, combined with the near uniform practice of other jurisdictions, means that, at a minimum, an indemnity provision must explicitly provide for recovery of attorney fees incurred in a direct action against an indemnitor. *Id.* at 806–07. The indemnification clause here, however, does not do so. Accordingly, the Bells are not entitled to indemnification for their attorney fees from the litigation against Kokosing.

**ii.**

The Bells next seek the attorney fees and costs they incurred in defending against the administrative proceedings with KDEP. Although this scenario might or might not also fall outside the general purview of indemnity agreements, Kokosing conceded at argument that such fees and

costs could be covered by the indemnification clause here.[5]  So we provide the indemnification clause with that interpretation.

The district court and Kokosing's treatment of this issue in its ruling and appellate briefing, respectively, leave much to be desired.  The district court, for its part, did not appear to appreciate that the Bells' request for indemnification involved attorney fees and costs from *two* separate proceedings:  the instant litigation and the KDEP administrative proceedings.  That oversight likely could have been corrected had the Bells moved for reconsideration, but they didn't.  *See* Fed. R. Civ. P. 59, 60.  Meanwhile, Kokosing's appellate briefing largely echoed the district court's rationale, arguing that the indemnity provision could not be used to recover attorney fees "for suing Kokosing, their indemnitor."  Kokosing's Br. at 42.

Those missteps, however, don't prevent us from affirming.  During oral argument, Kokosing asserted that the Bells never provided proof of the attorney fees and costs that they incurred in the administrative forum and that such mistake was fatal to the Bells' claim.[6]  It made a similar argument before the district court:  "[t]o the extent the Bells claim any fees from the notice of violation issued by KDEP, which they have not disclosed to date, they must prove their existence."  Def.'s Mot. for Summ. J., R.82 at PageID 2006.  And Kokosing is right.  The Bells needed to provide proof of attorney fees and costs from that forum.  *See Webb v. Bd. of Educ. of*

---

[5]  Before argument, Kokosing had not made such an explicit concession.  So the issue before the district court appears to have been much different from the one we face now.

[6]  Granted, Kokosing didn't make this argument in its appellate briefing.  But "we may affirm on any grounds supported by the record."  *Gammons v. Adroit Med. Sys., Inc.*, 91 F.4th 820, 825 (6th Cir. 2024); *see also Leary v. Daeschner*, 228 F.3d 729, 741 n.7 (6th Cir. 2000) (explaining that though an appellant can forfeit an argument by failing to raise it on appeal, the same is not true of an appellee).

*Dyer Cnty.*, 471 U.S. 234, 242 (1985) ("[T]he party seeking an award of fees has the burden of submitting 'evidence supporting the hours worked and rates claimed.'" (citation omitted)); *cf. Mo-Jack Distrib., LLC v. Tamarak Snacks, LLC*, 476 S.W.3d 900, 910 (Ky. Ct. App. 2015) (requiring courts to consider the "[a]mount and character of services rendered," and the "[l]abor, time, and trouble involved" when assessing attorney fees). But at most, the Bells direct us to one of their attorney fee contracts and an exhibit of their combined attorney fees and expenses from this litigation and the administrative proceeding.[7] That generalized information, which does not differentiate the fees in each forum, is not enough. Without specific proof of the fees they incurred, the Bells' request fails.

There may be an explanation for the Bells' failure to provide such proof. After all, they wanted the indemnification issue to be referred to a magistrate judge. Perhaps they were just waiting to provide the information then. But that doesn't absolve their failure. Whether to refer an issue to a magistrate judge is generally within the district court's discretion. *See* 28 U.S.C. § 636(b)(3); *Callier v. Gray*, 167 F.3d 977, 980 (6th Cir. 1999) ("[Section] 636 deals with the type of proceeding and matters that the district court *may* refer to a magistrate judge." (emphasis added)). And the Bells haven't presented any arguments explaining how the court abused that discretion here.

The dissent would have us reverse because, in its view, the district court "never allowed the Bells to develop the record" on this point. But by our count, the Bells had at least two chances

---

[7] The Bells seem to have presented a similar "Summary Billing Sheet[]" to Kokosing when they demanded indemnification before they sued. Email Chain, R.84-26 at PageID 2459. In response, Kokosing asked for "detailed billing statements." *Id.* But it appears that the Bells never followed up with such documents.

to do so. The Bells could have responded to this sufficiency of proof argument first during summary judgment proceedings—when it was directly raised by Kokosing. They chose not to. The Bells also could have done so in their proposed findings of fact and conclusions of law. Though the district court said it didn't "plan on addressing [indemnification]," it also told the parties that if they "want[ed] to address it, [they] can." Trial Tr., R.168 at PageID 6242. But again, the Bells didn't develop the record further. At the end of the day, the Bells are responsible for their claim's failure, not the district court.

\*     \*     \*

For these reasons, we affirm the district court's denial of the Bells' request for attorney fees and costs.

### 2.     Fraudulent Misrepresentation

The Bells also ask us to reverse the district court's ruling on their fraudulent misrepresentation claim. To prevail, the Bells had to prove six elements by clear and convincing evidence. *Waldridge v. Homeservices of Ky., Inc.*, 384 S.W.3d 165, 171 (Ky. Ct. App. 2011) (citing *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999)). The district court held that they failed to prove the third, which required them to show that Kokosing made a representation it knew was false or that it made recklessly. *Id.* We agree but add that the Bells also failed to prove the second element, requiring falsity. *See id.*

The Bells claim Kokosing intentionally misrepresented that the fill from Site 20 was tested[8] and contained no contaminants. That alleged misrepresentation contains two statements: (1) the

---

[8] At first, the Bells said that Kokosing told them the fill had been "*analytically* tested." Appellant's Br. 25 (emphasis added). But Mr. Bell did not testify to that at trial. He said only that Kokosing

soil was tested, and (2) the soil was non-contaminated. Neither constitutes a fraudulent misrepresentation.

Begin with the first statement. To prevail, the Bells had to prove that it wasn't true. *Id.* The district court, however, found that ATC *did* test Site 20's soil. And that factual determination was not clearly erroneous. An ATC employee testified that the company performed non-invasive geophysical testing of Site 20. Though the Bells insist that other testimony from the bench trial undercuts that finding, none is the smoking gun they claim. One statement even reinforces that ATC performed "extensive . . . testing" on Site 20's soil. Trial Tr., R.167 at PageID 6067. At most, the testimony shows that ATC didn't perform *invasive* testing and that all testing was completed before any soil was delivered. But that doesn't mean testing *never* occurred. Kokosing's first statement thus was not a misrepresentation.

That leaves the statement that "the soil was non-contaminated," which did turn out to be false. Even so, Kokosing is not liable. The Bells also had to show that Kokosing made that statement knowing it was false or with reckless disregard for whether it was true. *Waldridge*, 384 S.W.3d at 171. In the comparable actual-malice context, Kentucky courts have described reckless disregard as requiring a "high degree of awareness" that a statement is probably false. *Ball v. E.W. Scripps Co.*, 801 S.W.2d 684, 689 (Ky. 1990) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). Put differently, one needs "serious doubts as to the truth" of the statement. *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). The Bells, however, failed to show that Kokosing possessed that intent.

---

told him the soil had been "tested," without specifying how. Trial Tr., R.166 at PageID 5807, 5808. We therefore construct the alleged misrepresentation using only "tested."

The district court found that Kokosing "believed it was telling Mr. Bell the truth." Findings, R.173 at PageID 6337 ¶ 30. Ample testimony supports that finding. For one, MSD provided Kokosing with ATC's report and Strand Associates's map. Those two documents labeled all the relevant fill as non-contaminated. For two, the construction contract between MSD and Kokosing told Kokosing to assume all excavated material was not contaminated. A Kokosing employee testified that the company relied on all that information. Accordingly, the record shows that Kokosing did not know any better or have reason to do so.

The Bells try to inject evidence of doubt—to show reckless disregard—into the record. They claim that when Mr. Bell asked Kokosing for proof of test results, Kokosing gave him the runaround. Standing alone, that testimony might suggest that Kokosing knew something was wrong with the soil. But the Bells overlook Mr. Bell's testimony on cross-examination that when he asked for ATC's contact information, Kokosing responded within two hours. So Kokosing did not appear to be anything but forthright.

Because Kokosing's alleged misrepresentation was partially true and not made with the requisite intent for fraud, we affirm the district court's ruling on fraudulent misrepresentation.

### 3. Intentional Trespass

Finally, the Bells challenge the district court's ruling on their claim for intentional trespass. As to that claim, the district court partially ruled in the Bells' favor. It held Kokosing liable for the 68 loads of dirt that Ashcraft dumped on October 19 because, by then, Kokosing had actual notice that Site 20's soil was contaminated. But that liability didn't prove to be worth much monetarily as the court awarded the Bells only nominal damages. Though Kokosing had trespassed, the court determined that the Bells lacked actual damages.

On appeal, the Bells contend that the district court defined Kokosing's trespass too narrowly. They believe an intentional trespass started on October 2, 2017 because, they argue, Kokosing had the requisite intent for intentional trespass since the first day of delivery. We disagree.

**a.**

Whether the dumping before October 19 was an intentional trespass depends on its nature. *Church & Mullins Corp. v. Bethlehem Mins. Co.*, 887 S.W.2d 321, 323 (Ky. 1992). Was it innocent or was it willful? *See id.* Under Kentucky law, we presume the latter unless Kokosing proves otherwise. *Id.* (citing *Swiss Oil Corp. v. Hupp*, 69 S.W.2d 1037, 1041 (1934), *abrogated on other grounds by Harrod Concrete & Stone Co. v. Crutcher*, 458 S.W.3d 290 (Ky. 2015)). An innocent trespass is "the result of an honest mistake." *Harrod*, 458 S.W.3d at 297 (citation omitted). The innocent trespasser believes they are right. *Rudy v. Ellis*, 236 S.W.2d 466, 468 (Ky. 1951). A willful trespasser, however, knows they are wrong. *Id.* They act "in a spirit of wrongdoing" or recklessly.[9] *Swiss Oil*, 69 S.W.2d at 1041; *Harrod*, 458 S.W.3d at 298.

Having reviewed the trial testimony and the district court's factual findings, Kokosing's actions more closely align with those of an innocent trespasser. Those two things show that Kokosing honestly believed it was providing the Bells with uncontaminated soil.

---

[9] The Bells appear to attempt to equate recklessness with gross negligence. It is unclear whether, under Kentucky law, those phrases are coterminous. *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 52 (Ky. 2003) (defining gross negligence as a "wanton or reckless disregard for the safety of other persons"). *But see W.T. Sistrunk & Co. v. Meisenheimer*, 265 S.W. 467, 468 (Ky. 1924) ("[N]ot every case of gross negligence authorizes the assessment of punitive damages . . . there must be evidence of malice or willfulness, or a reckless or wanton disregard for the rights of others."). Even assuming they are, our analysis here would come out the same.

Consider first Kokosing's actions before it started excavation. It first reviewed ATC's report and Strand Associates's map. Both documents said that a portion of Site 20's soil was uncontaminated. To ensure that the Bells received only that soil, Kokosing had the site surveyed and marked according to Strand Associates's map.

Now turn to Kokosing's actions once excavation started. Kokosing first removed the soil from Site 20 that ATC and Strand Associates labeled as contaminated. It sent all that soil to a landfill. That, in theory, left only uncontaminated soil, which Ashcraft delivered to the Bells beginning on October 2.

When serious concerns about the soil arose nine days later, Kokosing trod lightly. It had its employees stop digging and called MSD. From that point on, per MSD's advice, Kokosing excavated only dry soil. And once Kokosing received word that even that soil was contaminated on October 17, it ordered dirt hauling from Site 20 to stop altogether.

In sum, Kokosing (1) relied on a report and map indicating that the soil was not contaminated; (2) attempted to follow those documents; and (3), when presented with potential evidence of contamination, investigated the issue. Considered together, these facts suggest that Kokosing honestly intended to provide contaminant-free soil to the Bells from October 2 to October 17. *See Lebow v. Cameron*, 394 S.W.2d 773, 777 (Ky. 1965) (finding an innocent trespass when the defendant sought advice from counsel and followed that advice); *cf. Harrod*, 458 S.W.3d at 298 (finding evidence of willfulness when the defendant "did not even attempt to apply" property information); *Jim Thompson Coal Co. v. Dentzell*, 287 S.W. 548, 549 (1926) (finding evidence of willfulness when the defendant ignored signs of trespass). The district court, which relied largely on the same facts in determining that Kokosing did not act willfully or recklessly, thus did not err.

**b.**

The Bells contend that we impermissibly allow Kokosing to rely on information from a third party to show innocence. As they see things, Kokosing had a non-delegable duty to act reasonably diligent, so it alone was responsible for ensuring the soil was contaminant-free. The Bells rely on two cases for that proposition: *Harrod* and *Jim Thompson Coal*. But neither suggests that a defendant cannot act with diligence while relying on a third party. *See Harrod*, 458 S.W.3d at 298–99; *Jim Thompson Coal*, 287 S.W. at 549. Indeed, *Harrod* seems to endorse the principle that third-party information can bear on a party's mental state. 458 S.W.3d at 298. In assessing willfulness, the court noted that engineers prepared maps for the defendant. *Id.* Other Kentucky cases have also found reliance on a third party, like counsel, probative of intent. *See, e.g.*, *Lebow*, 394 S.W.2d at 777. It is therefore appropriate for us (as it was for the district court) to consider Kokosing's reliance on ATC's report and Strand Associates's map.

**III.**

We affirm.

26

**KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.**

I agree with nearly all of the majority's opinion in this case. I disagree, however, with the conclusion that we should affirm the district court's judgment with respect to indemnification of the Bells' attorney fees related to the KDEP administrative proceedings. Because of the myriad issues associated with that claim, this case should be remanded to the district court so that it, and the parties, may fully develop the record and consider the issues.

Without a doubt, the Bells could have done more to flesh out their indemnification claim and to put forth more evidence of costs, including a detailed breakdown of their attorney fees. But the record is substantially more complicated than the majority opinion suggests. True, Kokosing raised in its summary-judgment brief that the Bells would need to prove their fees. R. 82 (Kokosing Mot. Summ. J. at 14) (Page ID #2006). The district court, however, punted the issue to trial. R. 98 (Summ. J. Op. at 20) (Page ID #3417). Yet at trial, precisely when the Bells' counsel raised the issue, the district court basically punted *again*, suggesting that it would revisit the issue—and likely hear further argument—should it determine that the indemnification clause covered the fees in the first instance. *See* R. 167 (Trial Tr. II at 4:3–5:8–15) (Page ID #5846–47) (district court explaining that "I don't think I am a big fan of putting carts before horses so let's just see where we are at the end [of the trial on the issue]"); *id.* ("If you want to rely on something else *post-trial to try to recover fees* . . . that's something that we can address, *if necessary*, later." (emphases added)); *id.* (district court agreeing to withhold further judgment on the issue until after it determined that the Bells were entitled to fees). At the end of trial, the district court reiterated the point when ordering the parties to submit proposed findings of fact and law. R. 168 (Trial Tr. III at 156:22–157:7) (Page ID #6241–42) ("I know there was some reference to indemnification.

27

That's not something that I'm going to initially address at this point. There was a reference to attorneys' fees. I don't plan on addressing that.").

The majority opinion now blames the Bells for their oversight, but it is apparent that the Bells were simply following the procedure laid out by the district court. Consistent with that procedure, the district court determined, in the first instance, that the Bells were not entitled to indemnification for their attorney fees and costs. But even Kokosing concedes that the indemnification clause covered the Bells' fees and costs incurred in the KDEP proceedings. It is apparent from the district court's findings of fact and conclusions of law that it did not appreciate that the Bells were seeking indemnification for *both* costs incurred in the action against Kokosing *and* costs incurred in the KDEP proceedings. R. 173 (Findings at 34) (Page ID #6359) (concluding only that the Bells were not entitled to fees incurred in the action brought by the Bells against Kokosing, but saying nothing about the KDEP proceedings). I agree that the Bells were not entitled to fees incurred in a direct action against their indemnitor. But everyone appears to agree that the Bells could seek other fees and costs. Because the district court found, both as a matter of law and as a matter of oversight, that the Bells could not recover those fees, it never allowed the Bells to develop the record.

Unfortunately for the Bells, the majority opinion simply compounds district-court error. In doing so, it prevents the Bells from recovering substantial potential costs and attorney fees under a bargained-for indemnification clause. Because the district court erred in the first step of its analysis and promised the Bells that it would allow them to develop the record and arguments *after trial* if it found that indemnification were warranted, the Bells are not to blame here. This case should go back to the district court for a hearing and further argument on the indemnification issue

28

with respect to the KDEP proceedings, and for this reason I respectfully dissent from the majority's holding on this issue.