NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name:  15a0483n.06

Case Nos. 14-3872 & 14-3931

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

FILED
Jul 01, 2015
DEBORAH S. HUNT, Clerk

WARREN DRILLING CO., INC.,                    )
                                              )
        Plaintiff-Appellee/Cross-Appellant,   )
                                              )    ON APPEAL FROM THE UNITED
v.                                            )    STATES  DISTRICT  COURT  FOR
                                              )    THE  SOUTHERN  DISTRICT  OF
EQUITABLE PRODUCTION CO.,                      )    OHIO
                                              )
        Defendant-Appellant/Cross-Appellee.   )
                                              )
                                              )

BEFORE:  MOORE, SUTTON, and WHITE, Circuit Judges.

SUTTON, Circuit Judge.  Warren Drilling Company drilled three natural-gas wells as an independent contractor for an entity once called Equitable Production Company and now called EQT.  After work on the wells ended, four residents of the area filed a lawsuit alleging that the companies contaminated their water supply.  In this action, Warren and EQT each claim that the other company is responsible for paying the defense costs of the contamination action.  The district court ruled that EQT must cover Warren's attorney's fees and settlement costs from the contamination action but not the attorney's fees Warren incurred in this lawsuit.  We affirm.

I.

EQT extracts natural gas from subsurface rock formations near the Appalachian Mountains through a process that has come to be known as fracking.  The company drills wells

thousands of feet underground to reach natural-gas-laden rock. It then injects a high-pressure mixture of water, sand, and chemicals into the wells, which cracks the underground rock and releases the natural gas for collection at the surface.

In 2006, EQT hired the Warren Drilling Company to drill three wells in West Virginia. The two companies signed a standard drilling contract, and operations began in November 2007. Warren handled the first step of the fracking process: well drilling. The injection/collection side of the operation belonged to EQT. Warren finished drilling the three wells in February 2008, after which it left the site.

In November 2010, Warren was served with a lawsuit. The plaintiffs were Dennis and Tamara Hagy, a couple who owned the surface rights to the West Virginia well site and lived nearby, and their two sons. Dennis and Tamara used groundwater to supply their home-plumbing needs and noticed that, after EQT's fracking operation began, their water had a "peculiar smell and taste." R. 29-3 at 6. The family became "physically sick" after drinking it and developed "neurological symptoms." *Id.* at 7. They sued EQT and Warren (among others), alleging that fracking fluid or some other hazardous liquid had seeped into the groundwater from the well site.

Warren had general liability insurance and asked the insurer to defend it from the Hagys' lawsuit. The insurer refused on the ground that Warren had not shown that the lawsuit fell within the policy's coverage requirements. Warren next sought aid from EQT, claiming it had a duty to defend and indemnify the company. EQT declined as well.

Warren settled with the Hagys for $40,000 in April 2012. The company never admitted any fault associated with the contaminated groundwater. A month after that settlement, the district court granted summary judgment to EQT on the ground that the Hagys had signed a

2

liability waiver when they granted EQT permission to drill on their land. The Fourth Circuit affirmed. *Hagy v. Equitable Prod. Co.*, 541 F. App'x 316, 318–19 (4th Cir. 2013) (per curiam).

Meanwhile, Warren filed this action against EQT and the liability insurer in Ohio state court. The complaint alleged that both companies had breached their contractual duties to defend and indemnify Warren in the *Hagy* action and sought settlement costs plus litigation fees as damages. Warren also sought attorney's fees incurred in the indemnification lawsuit itself. After the defendants removed the case to federal court, Warren settled with its insurer. EQT at that point counterclaimed against Warren, contending that Warren had a duty to indemnify EQT under the drilling contract, not the other way around.

Both parties moved for summary judgment. The district court sided in large part with Warren. It ruled that EQT had to indemnify Warren but that Warren was not entitled to attorney's fees incurred in connection with the indemnity-contract dispute. Both parties appealed.

II.

EQT's appeal raises three issues: (1) Did the drilling contract require it to indemnify Warren? (2) Did Warren have to prove that it was liable for the Hagys' claims in order to recover from EQT? and (3) Did Warren need to prove its settlement with the Hagys was reasonable?

*Indemnification under the drilling contract.* The drilling contract contains two provisions that bear directly on this dispute. Section 11.5 says:

> [Warren] shall assume full responsibility for and shall defend, indemnify, and hold [EQT] harmless from and against any loss, damage, expense, claim, fine and penalty, demand, or liability for pollution or contamination . . . originating on or above the surface of the land or water from spills, leaks, releases or discharges of . . . any [] liquid or solid whatsoever in possession and control of [Warren].

3

R. 29-3 at 1.  And section 11.6 says:

> [EQT] shall assume full responsibility and shall defend, indemnify, and hold [Warren] harmless from and against any loss, damage, expense, claim, fine and penalty, demand, or liability for pollution or contamination . . . not assumed by [Warren] in Subparagraph 11.5 . . . except to the extent such [incident] may be covered by [Warren]'s insurance or . . . is caused by or is the result of the negligence or willful misconduct of [Warren].

*Id.* at 3–4.

The key language appears in section 11.6, which requires EQT to indemnify Warren from its *Hagy*-related litigation costs.  Under that section, EQT must indemnify Warren against any claims related to "pollution or contamination" unless (1) Warren's insurance covered the claim, (2) Warren's "negligence or willful misconduct" caused the contamination, or (3) the claim is covered by section 11.5.  EQT concedes that the first and second exceptions do not apply, leaving one question to resolve:  Does the *Hagy* litigation fit within section 11.5?

We think not.  Section 11.5 requires Warren to indemnify EQT for any contamination-related claims that "originat[e] on or above the surface of the land or water from spills, leaks, releases or discharges" of any "liquid or solid" in Warren's "possession and control."  R. 29-1 at 3–4.  The record lacks any evidence that Warren ever "possess[ed]" or "control[led]" the contamination-causing substance:  fracking fluid.  And the record contains considerable evidence that the Hagys' groundwater contamination originated underground.  The Hagys' expert concluded that the contamination most likely originated in the "subsurface" rather than at the "surface," R. 57-24 at 9, for three reasons:  Chemical indicators in the groundwater pointed toward subsurface contamination as the causal pathway; prior drilling operations in the area and a nearby earthquake had likely caused subsurface fractures through which fracking fluid could migrate to the groundwater; and there was no evidence of a surface spill significant enough to "have infiltrated into the subsurface," R. 57-23 at 164–65.  All EQT could say in response was

that the Hagys' expert said it was *possible* for a surface spill to cause groundwater contamination. But EQT has no evidence any such surface spill occurred. The expert's statement alone is not enough to undermine the district court's summary judgment ruling. Only evidence, not speculation, may create a genuine issue of material fact. *See Kalamazoo River Study Grp. v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1072–73 (6th Cir. 1999); *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1359–60 (6th Cir. 1992). All of this means that section 11.5 does not apply, and section 11.6 does.

EQT offers several other rejoinders. What about section 11.1(f), one part of which seems to make Warren "solely responsible for . . . any loss or damage in excess of [its liability insurance's] policy limits, and/or any loss or damage that is not covered by [that] insurance"? R. 29-1 at 3. But that parsing removes the phrase from its essential context. Here is the paragraph in full:

> [Warren]'s insurance policies shall be primary. [EQT]'s insurance policy shall be in excess to [Warren]'s insurance policies until all of [Warren's] applicable and available insurance limits including umbrella and excess liability policies are exhausted. The intent is for [Warren]'s insurance policies to be primary regardless of any other insurance or methods of sharing language contained in [Warren]'s insurance policy or policies. [Warren] shall waive all rights of subrogation or contribution against [EQT] and its insurers. [Warren] shall be solely responsible for any deductible or self-insured retention provisions of its insurance, any loss or damage in excess of the policy limits, and/or any loss or damage that is not covered by the insurance required under this Insurance Section.

*Id.* As the full paragraph shows, section 11.1(f) makes Warren's insurance primary and limits Warren's access to EQT's excess insurance. It speaks to the role each party's *insurance company* plays in Warren's and EQT's business relationship and says nothing about either party's respective indemnification responsibilities.

Even if that were not the case, EQT's reading of section 11.1(f) would not work. If that section trumps section 11.6 any time Warren exhausts its liability insurance, as EQT suggests,

that would make section 11.6 superfluous. Section 11.6, remember, requires EQT to indemnify Warren from contamination-related lawsuits beyond the costs that Warren's insurance covers. Under EQT's reading of the drilling contract, Warren must pay all third-party litigation costs beyond what its insurance covers. That leaves section 11.6—and all of EQT's other indemnification duties—with no work to do. If by contrast we read section 11.6 as a carve-out of the broader section 11.1(f), that gives both sections meaning and independent work to do: Section 11.6 governs all claims related to underground contamination, and section 11.1(f) applies to everything else not governed by a more specific indemnity provision. Under Pennsylvania law, which all agree governs the contract, we should strive to give each section a role to play. *See Shehadi v. Ne. Nat'l Bank of Pa.*, 378 A.2d 304, 306 (Pa. 1977); *Baltic Dev. Co. v. Jiffy Enterps., Inc.*, 257 A.2d 541, 543 (Pa. 1969).

What about section 11.3, which says that, "[e]xcept to the extent [the drilling contract] specifically provides otherwise," Warren has to indemnify EQT from all claims for "bodily injury, death, or damage to property"? R. 29-1 at 3. Reliance on that section faces a different problem. The first clause of the section—"to the extent . . . provide[d] otherwise"—excludes it from applying here because section 11.6 provides otherwise.

What about section 11.8? That section once required EQT to indemnify Warren from claims stemming from harm to "any property right in or to oil, gas, or other mineral substance *or water*," but the parties struck out the "or water" language. *Id.* at 4 (emphasis added). Doesn't that show the parties removed EQT's indemnification obligations for all water-related claims? Yes and no. Yes, EQT need not protect Warren from claims of harm to a "property right in . . . water" under 11.8. But no, it does not exclude water-contamination claims from section 11.6.

Section 11.6 applies here, and under it EQT must indemnify Warren for its defense costs from the *Hagy* litigation.

*Actual liability.* EQT next argues that, even if the contract requires it to indemnify Warren, Warren may not recover any damages without proving its own responsibility for the Hagys' alleged injuries. We disagree.

Section 11.6 requires EQT to "defend" and "indemnify" Warren from any legal claim based on harm caused by "pollution or contamination." This language imposes two duties on EQT: the duty to indemnify and the duty to defend. Under Pennsylvania law, the duty to indemnify requires one party to pay the cost of another's *actual* legal liability to a third party. *See Kemper Nat'l P & C Cos. v. Smith*, 615 A.2d 372, 376 (Pa. Super. Ct. 1992). An indemnified party thus generally cannot recover the cost of voluntarily settling a lawsuit without proof that it caused the alleged injuries. *See id.* As both EQT and Warren agree, however, parties may contract around this requirement. *E.g.*, *U.S. Fid. & Guar. Co. v. Feibus*, 15 F. Supp. 2d 579, 583 (M.D. Pa. 1998), *aff'd*, 185 F.3d 864 (3d Cir. 1999); *see also Gordon v. Little*, 8 Serg. & Rawle 533, 550 (Pa. 1822), *overruled on other grounds by Coxe v. Heisley*, 19 Pa. 243, 247–48 (1852).

The duty to defend, which "is broader than [the] duty to indemnify," *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 540 (Pa. 2010), is one way of contracting around this requirement. The duty to defend requires the duty-bound party to provide the covered party with a legal defense from any claim "*potentially*" covered by the indemnification clause. *Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d 1363, 1368 (Pa. 1987). Once beckoned by the covered party, the defending party shirks this duty "at its own peril": Damages for breach include the expense of mounting a defense and reasonable costs to settle the case. *See Cadwallader v. New*

*Amsterdam Cas. Co.*, 152 A.2d 484, 486, 488–89 (Pa. 1959); *Pittsburgh Plate Glass Co. v. Fid. & Cas. Co.*, 281 F.2d 538, 541–42 (3d Cir. 1960).

The *Hagy* lawsuit triggered EQT's duty to defend Warren under section 11.6. The complaint alleged that some fluid—including potentially "fracking fluid"—"contaminated" the Hagys' "water supplies." R. 29-3 at 7. This claim "potentially" was covered by section 11.6, yet EQT refused to defend Warren when asked. EQT thus breached its duty to defend and must cover Warren's attorney's fees in *Hagy* plus the cost to settle. *See Cadwallader*, 152 A.2d at 486.

The result would be the same even if EQT had only a duty to indemnify Warren. That is because, under the contract, EQT and Warren displaced the common-law actual-liability rule. Section 11.6 provides that EQT must indemnify Warren from "any" legal "claim" or "demand" stemming from "pollution or contamination." A "claim" is a "demand for . . . a legal remedy." *Black's Law Dictionary* 301 (10th ed. 2014). A demand in turn is an "assertion of a legal or procedural right" or, to put the term in verb form, a request "to seek relief" or "to call into court." *Id.* at 522, 523. Any request for legal relief thus triggers EQT's duty to indemnify Warren. Such a sensitive trigger cannot function with the actual-liability standard acting as a safety. A request for relief may lack any basis at all; it is just a request and comes well before any determination of liability. If section 11.6 covers only *valid* requests, then it does not cover "any" requests. The words "any" "claim" or "demand" indicate an intent to displace an actual-liability rule. *Accord Bainville v. Hess Oil V.I. Corp.*, 837 F.2d 128, 131 (3d Cir. 1988).

EQT argues that an unpublished district court decision, *see Best Prods. Co. v. A.F. Callan & Co.*, C.A. No. 90-5329, 1997 WL 83737 (E.D. Pa. Feb. 26, 1997), cuts the other way. But it does no such thing. It held that the language "claim, damage, loss or expense" in an indemnity

clause did not displace Pennsylvania's actual-liability standard. *Id.* at *1. The decision distinguished the clause before it from clauses that included the term "demand," a word that appears in this contract and that *Best Products* implied would suffice. *See id.* at *7.

*Reasonableness of the settlement.* EQT adds that the district court erred by failing to require Warren to prove it settled with the Hagys for a reasonable amount. But the district court did require Warren to prove reasonableness; it ordered supplemental briefing on that precise issue. EQT at any rate "stipulate[d]" below that the settlement amount was reasonable. R. 72 at 2.

EQT pivots in its reply brief, arguing that the *choice* to settle, not just the *amount* of the settlement, must be reasonable. But even if EQT did not forfeit that argument by failing to raise it in its opening brief, *see Miller v. Admin. Office of Courts*, 448 F.3d 887, 893 (6th Cir. 2006), the "reasonableness" inquiry necessarily turns on the settlement amount, not the abstract choice to settle. *See Thomas v. Emp'rs Liab. Assur. Corp.*, 135 A. 614, 616 (Pa. 1927); *McClure v. Deerland Corp.*, 585 A.2d 19, 22–23 (Pa. Super. Ct. 1991); *Martinique Shoes, Inc. v. N.Y. Progressive Wood Heel Co.*, 217 A.2d 781, 783 (Pa. Super. Ct. 1966).

All in all, the district court correctly ordered EQT to indemnify Warren under the drilling contract. We thus affirm that part of the district court's judgment.

III.

Warren cross-appeals the district court's denial of attorney's fees incurred in *this action* to enforce the drilling contract's indemnity provisions. No error occurred.

Warren's claim turns on a (by now) familiar provision: section 11.6. To repeat, it says in relevant part: "[EQT] shall assume full responsibility and shall defend, indemnify, and hold [Warren] harmless from and against any loss, damage, expense, claim, fine and penalty, demand,

9

or liability for pollution or contamination." Warren, quite understandably, focuses on the "full responsibility," "hold . . . harmless," and "any loss, damage, expense" language. But that language does not stand alone. It permits all of this only for "expense[s] . . . for pollution or contamination." In context, the provision most naturally applies to the expenses incurred by Warren in the third-party action—which is to say the expenses (including the settlement and attorney's fees) that Warren incurred in defending the water-contamination action filed by the Hagys. It does not naturally apply to fees and expenses incurred in determining what the drilling contract—and its indemnification clause—means.

Also supporting this conclusion are these twin realities. The first is that every jurisdiction in the country, save Alaska, applies the American Rule with respect to attorney's fees. *See* Alaska R. Civ. P. 82(a); *Edwards v. Alaska Pulp Corp.*, 920 P.2d 751, 755 (Alaska 1996). That "bedrock principle" says that "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise" in "specific and explicit" terms. *Baker Botts L.L.P. v. ASARCO LLC*, No. 14-103 (U.S. June 15, 2015) (slip op. at 4). Pennsylvania applies the American Rule, *Herd Chiropractic Clinic, P.C. v. State Farm Mut. Auto. Ins. Co.*, 64 A.3d 1058, 1066 (Pa. 2013), and nothing in this contract explicitly makes EQT responsible for the attorney's fees incurred by Warren in this contract-dispute action over the meaning of the indemnity clause.

The second reality is that nearly every jurisdiction to consider the matter has applied the American Rule to indemnity actions like this one. Most jurisdictions thus presume that fees incurred in defending an indemnified claim are shifted to the indemnitor while fees incurred in ascertaining the existence of a duty to indemnify are not. Judge Friendly, as is so often the case, helpfully explains the distinction:

10

Indemnity obligations, whether imposed by contract or by law, require the indemnitor to hold the indemnitee harmless from costs in connection with a particular class of claims. Legal fees and expenses incurred in defending an indemnified claim are one such cost and thus fall squarely within the obligation to indemnify. Consequently, attorney's fees incurred in defending against liability claims are included as part of an indemnity obligation implied by law, and reimbursement of such fees is presumed to have been the intent of the draftsman unless the agreement explicitly says otherwise. As stated by the Fifth Circuit, "[t]his rule simply gives effect to the very nature of indemnity, which is to make the party whole." Such reasoning does not apply to fees and expenses incurred in establishing the existence of an obligation to indemnify, since such expenses are not by their nature a part of the claim indemnified against. Rather, they are costs incurred in suing for a breach of contract, to wit, the failure to indemnify. As such, fees and expenses incurred in establishing the indemnity obligation fall within the ordinary rule requiring a party to bear his own expenses of litigation.

*Peter Fabrics, Inc. v. S.S. Hermes*, 765 F.2d 306, 316 (2d Cir. 1985) (citations omitted).

Consistent with this reasoning, most jurisdictions hold that, absent a clear statement to the contrary, the indemnified party may not recover attorney's fees incurred in the course of determining the meaning or scope of an indemnity clause. *See, e.g.*, *Burr v. Lichtenheim*, 460 A.2d 1290, 1296–97 (Conn. 1983); *Chadwick-BaRoss, Inc. v. Martin Marietta Corp.*, 483 A.2d 711, 717 (Me. 1984); *Nova Research, Inc. v. Penske Truck Leasing Co.*, 952 A.2d 275, 285 (Md. 2008); *Celotex Corp. v. Becknell Constr., Inc.*, 325 So. 2d 566, 568–69 (Miss. 1976); *Merrimack Sch. Dist. v. Nat'l Sch. Bus Serv., Inc.*, 661 A.2d 1197, 1200–01 (N.H. 1995); *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903, 905 (N.Y. 1989); *United Gen. Ins. Co. v. Crane Carrier Co.*, 695 P.2d 1334, 1339 (Okla. 1984); *Smoak v. Carpenter Enters., Inc.*, 460 S.E.2d 381, 383 (S.C. 1995); *Scherf v. Myers*, 258 N.W.2d 831, 836 (S.D. 1977); *Jones v. Strom Constr. Co.*, 527 P.2d 1115, 1119 (Wash. 1974) (en banc); *Pennant Serv. Co. v. True Oil Co.*, 249 P.3d 698, 711 (Wyo. 2011). Just two jurisdictions appear to go the other way. *See Pike Creek Chiropractic Ctr., P.A. v. Robinson*, 637 A.2d 418, 422 (Del. 1994); *Allen v. Standard Oil Co.*, 443 N.E.2d 497, 500 (Ohio 1982).

Missing from this list, we realize, is a decision from the Pennsylvania Supreme Court. But we think that court would follow the majority rule for three reasons. First, it is not just a majority rule; virtually every jurisdiction follows it. Second, *Boiler Engineering & Supply Co. v. General Controls, Inc.*, 277 A.2d 812 (Pa. 1971), has gone part of the way down this road. As part of the reasoning in that decision, the court "adopt[ed] [the] principle" that an indemnified party may recover "only those [costs and attorney's fees] engendered by the *defense* litigation and not that portion allocable to the *indemnification* litigation." *Id.* at 814. True, it made this statement in connection with determining whether a "nominal" indemnitee (an indemnified party who had already recouped its defense costs through separate liability insurance) could recover fees from an indemnitor. *See id.* But no Pennsylvania court since then has called this language into question. Third, application of the majority approach here merely represents a specific application of Pennsylvania's general clear-statement requirement for abrogating the American Rule.

Warren argues in the alternative that, even if we apply the American Rule to this dispute, the "hold harmless" phrase in section 11.6 suffices to place explicit liability for fees on EQT. Two cases from other jurisdictions, the company adds, have held that this language may demonstrate an intent to shift attorney's fees in actions to enforce the indemnity agreement. *See Pike Creek*, 637 A.2d at 422–23; *Worth v. Aetna Cas. & Sur. Co.*, 513 N.E.2d 253, 257 (Ohio 1987). But *Pike Creek* makes clear that Delaware adopts the Alaska rule in the context of indemnity clauses that require an indemnitor to hold the indemnitee harmless "against any liabilities and expenses, including attorney's fees" that "result from any acts and [o]missions" of the indemnitor. 637 A.2d at 419–20. Pennsylvania courts have not embraced Alaska's approach. And the indemnity agreement in *Worth* explicitly provided for attorney's fees

12

incurred in enforcing the contract. 513 N.E.2d at 257. Not so here. Under section 11.6, Warren may recover only "expense[s] . . . for pollution or contamination." No right to recover attorney's fees in an indemnification action, whether by name or in some other explicit way, exists under this contract.

Neither *Winston Network, Inc. v. Indiana Harbor Belt Railroad Co.*, 944 F.2d 1351 (7th Cir. 1991), nor *Maule v. Philadelphia Media Holdings, LLC*, Civ. A. No. 08-3357, 2010 WL 3859613 (E.D. Pa. Oct. 1, 2010), is to the contrary. In *Winston*, one party agreed to indemnify the other for "any and all . . . costs . . . arising from, or in connection with . . . the inclusion of" the indemnitee in "any civil or criminal action arising from the[ir] contractual relationship." 944 F.2d at 1361. When the indemnitor sought a declaration of its responsibilities under the agreement, the indemnitee sought attorney's fees for having to litigate the declaratory-judgment action. The Seventh Circuit, applying Pennsylvania law, rightfully granted that request. By seeking declaratory relief, the indemnitor "inclu[ded]" the indemnitee in a civil action "arising from the[ir] contractual relationship," entitling the latter to "any and all . . . costs." *Id.* Similarly, the provision in *Maule* covered "expenses (including reasonable attorney's fees) . . . arising out of or relating to . . . any breach of" the contract. 2010 WL 3859613, at *5. These contracts plainly required the shifting of fees; this contract does not, as section 11.6 of the drilling contract contains no such clear statement.

For these reasons, we affirm.

13