# United States Court of Appeals
## For the First Circuit

No. 19-2113

KEN JOHANSEN, individually and on behalf of all others
similarly situated,

Plaintiff,

v.

LIBERTY MUTUAL GROUP INC.,

Defendant/Third-Party Plaintiff-Appellee,

SPANISH QUOTES, INC., d/b/a WeSpeakInsurance,

Defendant,

LIBERTY MUTUAL INSURANCE COMPANY,

Third-Party Plaintiff-Appellee,

v.

DIGITAS, INC.,

Third-Party Defendant-Appellant,

PRECISE LEADS, INC.,

Third-Party Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Howard and Thompson, Circuit Judges,
and Arias-Marxuach, District Judge.*

_____

* Of the District of Puerto Rico, sitting by designation.

————————————

Laura Greenberg-Chao, Henshon Klein LLP, Michael Dockterman, and Steptoe & Johnson LLP on brief for Digitas, Inc., appellant.
Manleen Singh, Anthony A. Froio, Eric Magnuson, and Robins Kaplan LLP on brief for Liberty Mutual, appellee.

————————————

September 25, 2024

————————————

**HOWARD**, <u>Circuit Judge</u>.  When Ken Johansen sued Liberty Mutual for violating the Telephone Consumer Protection Act (TCPA), Liberty Mutual and Digitas, Inc. disputed whether Johansen's claim triggered Digitas's duty to indemnify Liberty Mutual.  Even after Johansen's class action was settled and dismissed, the third-party wrangling between Liberty Mutual and Digitas escalated, as each day made the case more expensive to resolve.  Today, we move this protracted saga toward closure.  The district court found that Digitas violated its contractual duty to indemnify Liberty Mutual and thus partially granted Liberty Mutual's motion for summary judgment.  Notwithstanding a thorny question of appellate jurisdiction, we agree with the district court that Digitas breached its warranty and that Liberty Mutual satisfied the requisite preconditions to trigger Digitas's indemnity obligation.  We affirm.

## I.

This appeal involves a small web of contractual arrangements intended to help Liberty Mutual grow its customer base.[1]  First and foremost, Liberty Mutual, a diversified auto

---

[1]  We take the facts from the parties' summary-judgment submissions and present them in the light most favorable to the non-moving party.  See <u>Lachance</u> v. <u>Town of Charlton</u>, 990 F.3d 14, 17 n.1 (1st Cir. 2021).  Though the parties filed cross-motions for summary judgment, we construe Digitas as the party that is due this favorable standard of review because only Digitas appealed the district court's summary-judgment ruling.

insurer, contracted in 2012 with Digitas, a marketing services provider. Under the agreement (the "Master Services Agreement" or "MSA"), Digitas promised to deliver services as defined in ensuing statements of work, which subsequently included "interactive marketing" through "paid search, aggregator, affiliate and landing pages (tracking and readout only)." Digitas warranted that these services would "conform to [Liberty Mutual's] requirements as specified in the applicable [statement of work]." Digitas also extended its warranty to third-party contracts, promising to provide to Liberty Mutual "the full benefit of all covenants, warranties, representations and indemnities granted to Digitas by third parties."

The MSA also contained an indemnification provision. Each party agreed to indemnify the other against "all third[-]party claims, damages, liabilities, costs and expenses, including reasonable legal fees and expenses . . . , arising out of any breach of any warranty . . . by the indemnifying party." In addition to a breach of warranty, the MSA conditioned any indemnity obligation on three prerequisites:

> (i) prompt written notice by the indemnified party to the indemnifying party of any claim, action, or demand for which indemnity is claimed; (ii) the opportunity for complete control of the defense and settlement thereof by the indemnifying party; and (iii) such reasonable cooperation, at the indemnifying party's expense, by the indemnified party in

the defense as the indemnifying party may request.

Liberty Mutual separately executed a similar marketing agreement with Precise Leads, Inc. to "generat[e] call volume" with prospective consumers. The Precise Leads contract also contained an indemnification provision. For its part, Digitas separately contracted with Spanish Quotes, Inc., which acted as an insurance shopping tool to help customers find insurance quotes. In doing so, Spanish Quotes warranted that its services would meet Digitas's specifications and would not violate any laws, rules, or regulations.

In 2014, a person identified as "Rita Johansen" visited autoquotesdirect.com, expressed interest in purchasing car insurance, and consented to fielding calls from insurers, including Liberty Mutual. Months later, Ken Johansen received a phone call from a representative of Auto Insurance Services. Johansen confirmed that he had requested a car insurance quote, and Auto Insurance Services transferred the call to Liberty Mutual. After three similar calls and transfers, Johansen complained to Liberty Mutual that telemarketers had been calling his home. Because it was apparent that the calls originated from a Spanish Quotes call source, Liberty Mutual contacted Digitas to inform Digitas of Johansen's allegations and to request that Spanish Quotes "track down the source based on the caller ID and shut them

down." Digitas confirmed that its work, and the work of its contractual partners, should not include outbound calls that were then transferred to Liberty Mutual.

Johansen filed a putative class-action complaint in July 2015 against Liberty Mutual and Spanish Quotes under the TCPA.[2] See 47 U.S.C. § 227. Johansen alleged that Spanish Quotes violated the TCPA by, among other acts, soliciting members of the National Do-Not-Call Registry multiple times in a year. He also alleged that Liberty Mutual was responsible for ensuring that Spanish Quotes complied with the TCPA.

Liberty Mutual promptly informed Digitas of Johansen's lawsuit and referenced the MSA's indemnity provision. Digitas responded five months later that it was "inclined to enter into an agreement with Liberty to fund 40% of the defense of the underlying TCPA action if Precise Leads [did] the same." Shortly thereafter, Digitas again offered to pay for the defense under certain conditions, one of which included Liberty Mutual covering a portion of its costs of cooperation. Liberty Mutual rejected the offer, pointing to the MSA's requirement that indemnitee cooperation come "at the indemnifying party's expense."

---

[2] "The TCPA restricts the making of telemarketing calls and the use of automatic telephone dialing systems and artificial or prerecorded voice messages. The rules apply to common carriers as well as to other marketers." FCC, FCC Actions on Robocalls, Telemarketing (July 23, 2018), https://www.fcc.gov/general/telemarketing-and-robocalls [https://perma.cc/77EZ-UJEZ].

Unable to agree on indemnification, Liberty Mutual filed a third-party complaint against Digitas and Precise Leads, thus beginning the litigation now before us. The third-party complaint would come to include claims for breach of contract and negligence against Digitas and Precise Leads, as well as a cross-claim for contractual indemnity against Spanish Quotes. The district court denied Digitas's motion to dismiss, finding that the MSA required only an opportunity for control -- not actual tender -- of the defense. Meanwhile, Digitas continued to attempt to negotiate the scope of its indemnity obligation with Liberty Mutual. Digitas's third offer contemplated resolving any indemnity issues through private mediation. Its fourth and final offer excluded from Digitas's indemnity obligation fees for the third-party litigation and nullified any further obligations under the MSA unless Liberty Mutual suffered an adverse judgment based on a specific finding of Digitas's breach.

Johansen proposed to settle his individual claims in January 2018. Throughout the settlement negotiations, Digitas maintained that it had no duty to indemnify Liberty Mutual because Liberty Mutual had not met the preconditions in the MSA. Nevertheless, Liberty Mutual worked with Digitas to draft and finalize an agreement to settle Johansen's claims. Johansen eventually agreed to a five-figure settlement, and the district court dismissed his claims against Liberty Mutual with prejudice.

The third-party squabbling between Liberty Mutual and Digitas persisted,[3] even after Liberty Mutual settled its third-party claims against Precise Leads. Liberty Mutual and Digitas filed cross-motions for summary judgment on February 28, 2019. Liberty Mutual sought attorney's fees and its share of the Johansen settlement payment. Digitas sought dismissal of the third-party claims.

The district court found that Digitas violated its duty to indemnify Liberty Mutual and partially granted Liberty Mutual's cross-motion for summary judgment. It also partially denied Liberty Mutual's cross-motion, insofar as Liberty Mutual's claim of negligence was premised upon a finding that Digitas was liable to Johansen for violating the TCPA. Accordingly, the district court also partially denied and partially granted Digitas's cross-motion. The court closed the case without determining damages. Twenty-nine days later, Digitas filed this appeal.

With our leave, Liberty Mutual filed a motion under Federal Rule of Civil Procedure 60(a)[4] asking the district court

---

[3] The dispute between Liberty Mutual and Spanish Quotes also continued. But because Spanish Quotes never moved for summary judgment, that dispute is not a part of this appeal.

[4] Rule 60(a) allows a court to "correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." Fed. R. Civ. P. 60(a). "[A]fter an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave," id., which we granted here.

to reopen the case and assess damages. The district court denied the motion. Because, it reasoned, Rule 60(a) is intended to fix "mechanical or mathematical mistake[s]," it was an "inappropriate mechanism" through which to add damages. In response to our subsequent request for clarification, the district court specified that it had intended the judgment to be final. The court explained that it had "assumed that the indemnification dispute involved a sum certain and that the parties did not want or need an evidentiary hearing" because Liberty Mutual had never submitted damages evidence, even during the twenty-nine days between judgment and appeal. "Should such a hearing be necessary," the court suggested, it could conduct one once we dispensed of Digitas's pending appeal.

## II.

Before proceeding to the merits of Digitas's appeal, we must first address Liberty Mutual's insistence that we lack appellate jurisdiction. Liberty Mutual argues that we lack jurisdiction under 28 U.S.C. § 1291 because a judgment, like the one here, that "adjudicates only liability and not damages[ ]is not a final order." Mullen v. St. Paul Fire & Marine Ins. Co., 972 F.2d 446, 450 (1st Cir. 1992) (quoting Domegan v. Fair, 859 F.2d 1059, 1062 (1st Cir. 1988)); 15B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3914.28 n.6 (2d ed. 2024) (collecting cases). The adjudication of

attorney's fees, however, comprises an exception to this general principle. See Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs and Participating Emps., 571 U.S. 177, 179 (2014) ("Whether the claim for attorney's fees is based on a statute, a contract, or both, the pendency of a ruling on an award for fees and costs does not prevent, as a general rule, the merits judgment from being final for purposes of appeal."). The parties argue at length, and on the backdrop of an imperfect record, about whether that exception applies to the attorney's fees at issue here and whether Liberty Mutual's damages claim comprises more than attorney's fees.

"The parties' arguments weave a jurisdictional riddle, which is both intricate and difficult to resolve." Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 91 (1st Cir. 2020). Thankfully, "the exigencies of [this] particular case do not require" a "rush to decide" this issue. Id. (quoting Privitera v. Curran, 855 F.3d 19, 22 (1st Cir. 2017)). Where a "case poses a question of statutory, not Article III, jurisdiction" and where "a decision on the merits will favor the party challenging the court's jurisdiction," we may assume that we have jurisdiction to reach the merits of an appeal. Caribe Chem Distribs., Corp. v. S. Agric. Insecticides, Inc., 96 F.4th 25, 28 (1st Cir. 2024) (quoting Doe v. Town of Lisbon, 78 F.4th 38, 45 (1st Cir. 2023)); see Akebia Therapeutics, 976 F.3d at 91-92 ("Although hypothetical

- 10 -

jurisdiction is generally disfavored, such a barrier is insurmountable only when Article III jurisdiction is in issue." (internal citations omitted)). Here, the only potential jurisdictional barrier is statutory, see 28 U.S.C. § 1291, and -- as discussed below -- our merits decision favors Liberty Mutual, the party challenging our jurisdiction. See United States v. Ayala-Lopez, 457 F.3d 107, 108 (1st Cir. 2006) ("[T]here is no need to reach a more difficult non-Article III issue of appellate jurisdiction [under § 1291] if the case may be easily disposed of on the merits."); Doe, 78 F.4th at 44 (same); 15A Wright, Miller & Cooper, supra, § 3905 (deeming "clearly appropriate" our practice of "affirm[ing] a judgment if the result on the merits is easier to reach than a thorny question of [appellate] jurisdiction"); id. § 3905 n.22 (collecting cases). We tarry no further. Because the merits squarely favor Liberty Mutual, we bypass the jurisdictional conundrum and resolve this case on straightforward contractual interpretation.

## III.

We review the district court's summary-judgment order de novo. See Dukes Bridge LLC v. Beinhocker, 856 F.3d 186, 189 (1st Cir. 2017); Bukuras v. Mueller Grp., LLC, 592 F.3d 255, 261 (1st Cir. 2010). The presence of cross-motions for summary judgment "neither dilutes nor distorts [our] standard of review." Great Lakes Ins. SE v. Andersson, 89 F.4th 212, 217 (1st Cir. 2023)

- 11 -

(quoting Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006)); Bukuras, 592 F.3d at 261. "Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Anvar v. Dwyer, 82 F.4th 1, 7 (1st Cir. 2023) (quoting Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004)).

Because the parties agree that the indemnification provision presents "a pure question of law regarding the interpretation of unambiguous terms," we also review the district court's contractual interpretation de novo. See Caldwell Tanks, Inc. v. Haley & Ward, Inc., 471 F.3d 210, 215 (1st Cir. 2006). Following the parties' lead, we apply Massachusetts law, under which the intention of the parties guides our interpretation. See Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 784 (1st Cir. 2011); Bukuras, 592 F.3d at 262. As ever, we understand words to carry their "usual and ordinary" meaning and read the whole contract "in a reasonable and practical way, consistent with its language, background, and purpose." Bukuras, 592 F.3d at 262 (quoting Cady v. Marcella, 49 Mass. App. Ct. 334, 338 (2000)).

The district court found that Digitas violated its contractual duty to indemnify Liberty Mutual because Digitas breached its warranty and Liberty Mutual satisfied the prerequisites to trigger Digitas's indemnity obligation. Digitas argues on appeal that it could not have breached warranty absent

a finding of actual liability and that Liberty Mutual did not satisfy the MSA's prerequisites because its extracontractual demands burdened Digitas's assumption of the defense. Finding these objections unpersuasive, we affirm the district court.

## A.

The MSA conditioned indemnity on the indemnitor's "breach of any warranty, representation, covenant, obligation or agreement." Liberty Mutual argues that Digitas breached its warranty by allowing "warm transfers" in its campaign, some of which formed the basis of Johansen's complaint and about which Digitas knew. Digitas disputes none of these facts on appeal.[5] Instead, Digitas argues that demonstrating Digitas's breach of warranty required finding "a violation of the TCPA by Digitas," a finding the district court did not make. We disagree.

"Where, as asserted here, the duty to indemnify arises out of contract instead of as a matter of law, 'the question of whether actual liability is a prerequisite to the duty to indemnify

---

[5] In the customer-service industry, a "warm transfer" is the routing of a customer call from an operative to a colleague after the operative has explained to the colleague the context of the call. Vonage, Warm Transfer vs. Cold Transfer (Jan. 18, 2024), https://www.vonage.com/resources/articles/warm-transfer [https://perma.cc/LW4N-QYTB]. The parties attach to the term a slightly different meaning, which incorporates an "outbound dial" to a potential customer. It is this outbound dialing that Johansen alleged violated the TCPA. To be clear, however, these technical details do not bear on the third-party action here. For our purposes, it is sufficient to note that Digitas does not dispute that it breached its warranty by allowing warm transfers.

- 13 -

is answered by reference to what the parties . . . intended, as reflected in the [contractual] language.'" Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1094 (1st Cir. 1989) (quoting Bainville v. Hess Oil V.I. Corp., 837 F.2d 128, 131 (3d Cir. 1988)). Here, the parties agreed to indemnify each other from "any and all third[-]party claims, damages, liabilities, costs, and expenses . . . arising out of any breach of any warranty." The plain language of the provision clearly encompasses a "third[-]party claim" like Johansen's. See Samos Imex Corp. v. Nextel Commc'ns, Inc., 20 F. Supp. 2d 248, 253 (D. Mass. 1998) (finding an indemnification clause activated upon claim alleging liability, "and not just on final judgment of liability," where clause extended to claims). A "claim" is a "demand for money, property, or a legal remedy." Claim, Black's Law Dictionary (12th ed. 2024). "Such a sensitive trigger cannot function with the actual-liability standard acting as a safety," especially because the MSA further lowered the bar by modifying "claim" with "any and all." Warren Drilling Co. v. Equitable Prod. Co., 621 F. App'x 800, 805 (6th Cir. 2015) ("The words 'any' [or] 'claim' . . . indicate an intent to displace an actual-liability rule."); see also Fashion House, 892 F.2d at 1093-94 (binding an indemnitor to an indemnitee's settlement where "broad" and "sweeping" indemnification clause extended to any "liability, loss, claim, suit, judgment and cause of action, or expense"); Trs. of N.Y.,

- 14 -

New Haven & Hartford Co. v. Tileston & Hollingsworth Co., 345 Mass. 727, 728, 732 (1963) (allowing an indemnitee "to bind the indemnitor to the result of a settlement" when indemnification clause extended to "loss, damage[,] or injury").

We conclude that the parties did not intend "breach of warranty" to necessitate a finding of actual liability. Because Liberty Mutual provides undisputed evidence that Digitas allowed "warm transfers" and that these transfers breached Digitas's warranty to Liberty Mutual, we affirm the district court's finding that Digitas breached its warranty under the MSA without reaching the question of whether Digitas violated the TCPA.

**B.**

Breach of warranty notwithstanding, the MSA further conditioned indemnity on the following three prerequisites:

> (i) prompt written notice by the indemnified party to the indemnifying party of any claim, action, or demand for which indemnity is claimed; (ii) the opportunity for complete control of the defense and settlement thereof by the indemnifying party; and (iii) such reasonable cooperation, at the indemnifying party's expense, by the indemnified party in the defense as the indemnifying party may request.

The parties agree that Liberty Mutual provided prompt written notice, satisfying the first requirement, but dispute whether the remaining requirements were satisfied. We conclude that Liberty

- 15 -

Mutual satisfied the second requirement and that Digitas's refusal to assume the defense rendered the third requirement unripe.

Undisputed facts in the record provide evidence that Liberty Mutual gave Digitas multiple opportunities for control of the defense. "[T]o establish tender of an opportunity to defend" under Massachusetts law, "[a]n indemnitee is 'not bound to make any formal and explicit demand,' beyond providing information alerting the indemnitor to the existence of the claim." Psychemedics Corp. v. City of Bos., 486 Mass. 724, 735-36 (2021) (quoting Tileston & Hollingsworth, 345 Mass. at 731). "Where the parties have an existing contractual relationship," as they do here, "it takes very little on the part of the indemnitee to indicate an intent to charge the indemnitor with the defense." Id. at 736. Liberty Mutual easily met this low burden in August 2015 when it notified Digitas of the Johansen claim and referenced the MSA's indemnification clause. The parties' subsequent and extensive communications about Digitas's indemnity obligation supply further undisputed evidence that Liberty Mutual provided the opportunity to control the defense.

On appeal, Digitas assumes its stance, twice rejected by the district court, that "Liberty Mutual was required to turn over the defense to Digitas or forfeit its right to indemnity." This interpretation of the MSA remains patently incorrect. The MSA required that Liberty Mutual give Digitas "opportunity" to control

- 16 -

the defense, not that Liberty Mutual actually tender the defense. Digitas's reading of the MSA disregards clear contractual language and conflicts with Massachusetts caselaw, see id. at 735-36; Tileston & Hollingsworth, 345 Mass. at 732-33.

Once Liberty Mutual gave Digitas notice and opportunity to control the defense, "the burden shift[ed] to [Digitas] proactively to attempt to assume the defense." Psychemedics Corp., 486 Mass. at 726 ("To attempt proactively to assume the defense entails good faith efforts promptly to assume and control the defense of the claims asserted."); see City of Bos. v. Worthington, 76 Mass. (10 Gray) 496, 498-99 (1858). Of course, Liberty Mutual had a corresponding duty to allow Digitas to assume the defense. See Psychemedics Corp., 486 Mass. at 742. Any "affirmative acts by [Liberty Mutual] thwarting, refusing, or in any way blocking efforts by [Digitas] to assume the defense" would relieve Digitas of its indemnity obligation. Id. at 743.

Digitas argues at length that Liberty Mutual did just that, burdening Digitas's assumption of the defense with extracontractual conditions.[6] As a legal matter, an indemnitee

---

[6] Digitas's briefs occasionally suggest that Liberty Mutual's alleged intransigence represented a "lack of cooperation" that precluded satisfaction of the MSA's third requirement: "such reasonable cooperation, at the indemnifying party's expense, by the indemnified party in the defense as the indemnifying party may request." But Liberty Mutual could not cooperate, nor did Digitas request any cooperation, "in the defense" because Digitas never assumed the defense and still disputes its status as "the

clearly cannot condition assumption of the defense on extracontractual demands. But as a factual matter, it was Digitas, not Liberty Mutual, who insisted on extracontractual conditions. Digitas, at various points, offered to assume the defense only if: Precise Leads did the same, Liberty Mutual covered its own costs of cooperation, indemnity disputes would be resolved through private mediation, previous legal fees were subject to Digitas's consideration, third-party-litigation fees were excluded, or any further obligations under the MSA were nullified absent an adverse judgment based on Digitas's breach. Each of these conditions either did not appear in or directly conflicted with the MSA. Thus, Liberty Mutual's rejection of them did not constitute thwarting, refusing, or blocking Digitas's assumption of the defense. See id.

We do not dispute Digitas's right to contest the scope of its indemnity obligation, as many of Digitas's proposed conditions did. But none of these scope-of-obligation objections affect what is, according to Digitas, "[t]he only issue on appeal[:] whether Liberty Mutual properly triggered Digitas'[s] indemnity obligations." Digitas could have assumed the defense

---

indemnifying party." Reading the MSA "in a reasonable and practical way," Bukuras, 592 F.3d at 262, Liberty Mutual is correct that "[t]he third condition was never ripe." Nevertheless, we construe Digitas's lack-of-cooperation allegations as support for the distinct argument that Liberty Mutual burdened Digitas's assumption of the defense.

- 18 -

under a reservation of rights, "the common-sense solution" to circumstances in which a party cannot "obtain[] a determination of [its] rights and obligations before the claimed performance is due." Restatement (Third) of Restitution and Unjust Enrichment § 35 cmt. a (Am. L. Inst. 2011); see id. § 35 cmt. c (explaining "a dispute over an indemnity obligation in an ordinary contract . . . might be resolved in a proper case by performance under protest and a subsequent claim in restitution"); Psychemedics Corp., 486 Mass. at 726 n.5. But Digitas has staked its appeal on the proposition that "Liberty Mutual failed to fulfill conditions precedent under the MSA." The appeal cannot survive our conclusion to the contrary.

## IV.

Digitas finally argues that, even if we affirm the district court, we should dismiss the case because "there is nothing further to be done below." According to Digitas, Liberty Mutual has no options to seek damages because it did not introduce damages evidence, file a timely post judgment motion, or appeal the final judgment. These are paradigmatic district-court issues. See, e.g., 11 Charles Alan Wright et al., Federal Practice and Procedure § 2857 (3d ed. 2024) ("Appellate review [of Rule 60(b) motions] is limited to determining whether the district court abused its discretion."); id. § 2872. We leave them to the district court.

**\*\*\***

For all these reasons, we **AFFIRM** the district court's judgment and remand for any further proceedings.  Each party shall bear its own costs.

**-Dissenting Opinion Follows-**

**ARIAS-MARXUACH**, <u>**District Judge**</u>, **dissenting.** I do not disagree with the majority's analysis of the merits of Digitas, Inc.'s appeal. Instead, I respectfully dissent due to my concerns about the majority's reliance on the hypothetical jurisdiction doctrine. With some exceptions, the subject-matter jurisdiction of the courts of appeals is limited to "final decisions of the district courts." 28 U.S.C. § 1291. Appellate courts have a duty to verify the existence of their own subject-matter jurisdiction. <u>See</u> <u>United States</u> v. <u>Horn</u>, 29 F.3d 754, 767-68 (1st Cir. 1994). In this case, however, the majority relies on a doctrine of hypothetical jurisdiction to sidestep that question and reach the merits of the appeal.

The hypothetical jurisdiction doctrine provides that if a "case poses a question of statutory, not Article III, jurisdiction," then "the question of jurisdiction 'need not be resolved if a decision on the merits will favor the party challenging the court's jurisdiction.'" <u>Caribe Chem Distribs. Corp.</u> v. <u>S. Agric. Insecticides, Inc.</u>, 96 F.4th 25, 28 (1st Cir. 2024) (quoting <u>Doe</u> v. <u>Town of Lisbon</u>, 78 F.4th 38, 44-45 (1st Cir. 2023)). The doctrine has been used to avoid jurisdictional questions arising under laws as varied as the Eleventh Amendment, the Illegal Immigration Reform and Immigrant Responsibility Act, the bankruptcy code, and the procedure governing appellate review of remands following removal. <u>See</u> <u>Parella</u> v. <u>Ret. Bd. Of R. I.</u>

Emps.' Ret. Sys., 173 F.3d 46, 53-57 (1st Cir. 1999) (Eleventh Amendment); Seale v. INS, 323 F.3d 150, 152-57 (1st Cir. 2003) (immigration law); Parkview Adventist Med. Ctr. v. United States ex rel. Dep't of Health & Hum. Servs., 842 F.3d 757, 760 (1st Cir. 2016) (bankruptcy code); Caribe Chem Distribs., Corp., 96 F.4th at 28 (removal procedure); see also Joshua S. Stillman, Hypothetical Statutory Jurisdiction and the Limits of Federal Judicial Power, 68 Ala. L. Rev. 493, 511 (2016) ("Courts have used hypothetical statutory jurisdiction to bypass a wide array of statutory subject-matter jurisdiction issues, such as those under the Foreign Sovereign Immunities Act, the Contract Disputes Act, the False Claims Act, the Freedom of Information Act, the supplemental jurisdiction statute, the Administrative Procedure Act, and the Alien Tort Statute.").

The hypothetical jurisdiction doctrine was generally rejected by a majority of the justices of the Supreme Court in Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998), because it "offends fundamental principles of separation of powers." Id. at 94. The Court reiterated that determining jurisdiction is "the **first and fundamental question**" in every appeal." Id. (quoting Great S. Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 453 (1900)) (emphasis added). "This question," the majority continued, "**the court is bound to ask and answer for itself, even when not otherwise suggested.**" Id. (emphasis added). "Jurisdiction is

- 22 -

power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Id. (quoting Ex parte McCardle, 74 U.S.(7 Wall.) 506, 514 (1868)). "This conclusion should come as no surprise," the Steel Co. majority wrote, as "[t]he requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" Id. (quoting Mansfield, C. & L.M. Ry. Co. v. Swan, 111 U.S. 379, 382 (1884)).

Despite Steel Co.'s strong condemnation of hypothetical jurisdiction, a First Circuit panel concluded in Parella v. Retirement Board of Rhode Island Employees' Retirement System that "the rule does not appear to be an absolute one." 173 F.3d at 53. The panel observed that two justices in the five-justice majority wrote a concurrence noting that the rule that jurisdictional questions be decided first had been diluted. Id. The Parella court also noted that the four justices that did not fully join the majority opinion disagreed that jurisdictional issues should always be decided before reaching the merits. Id. at 53-54. Finally, the panel in Parella emphasized that "[t]he decision in Steel Co. distinguishes between Article III jurisdiction questions and statutory jurisdiction questions, holding that the former should ordinarily be decided before the merits, but the latter need not be." Id. at 54. Thus, Parella held that "[t]he various

opinions in the case, read as a whole, are not entirely clear as to whether (or to what extent) Steel Co. undermines our earlier practice [of bypassing jurisdictional issues]."  Id. (citation omitted).

The above reading of Steel Co. notwithstanding, the separation-of-powers concerns implicated by reaching the merits of cases without ascertaining jurisdiction are far from trivial, even when dealing with statutory jurisdiction.  Article III vests the judicial power in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1.  Congress has the power to create inferior courts, and only it may define their jurisdiction.  See Sheldon v. Sill, 49 U.S. (8 How.) 441, 448-49 (1850).  Consequently, as this Court has repeatedly recognized, the inferior "[f]ederal courts are courts of limited jurisdiction." Am. Fiber & Finishing, Inc. v. Tyco Healthcare Grp., 362 F.3d 136, 138 (1st Cir. 2004).  "Thus, they can hear cases only if and to the extent that they are authorized to do so by statute." Rhode Island v. EPA, 378 F.3d 19, 22 (1st Cir. 2004) (citing Bell v. New Jersey, 461 U.S. 773, 777 (1983)).

While other circuits also rely on hypothetical jurisdiction to sidestep statutory subject-matter jurisdiction questions,[7] the

_____

[7] The Second, Third, Sixth, Eighth, Ninth, Tenth, D.C., and Federal Circuits appear to allow the exercise of hypothetical

- 24 -

desire to continue to rely on this doctrine is not monolithic. The Eleventh Circuit rejected the doctrine over a decade ago. See Friends of the Everglades v. EPA, 699 F.3d 1280, 1288-89 (11th Cir. 2012). Reasoning that "[w]e cannot exercise hypothetical jurisdiction any more than we can issue a hypothetical judgment," the Eleventh Circuit declined to reach the merits of a controversy because 33 U.S.C. § 1369(b)(1) did not grant the court subject-matter jurisdiction. Id. at 1289. Even in circuits where hypothetical jurisdiction remains in use, judges have written in detail to critique the doctrine. See Kaplan v. Central Bank of the Islamic Republic of Iran, 896 F.3d 501, 517 (D.C. Cir. 2018) (Edwards, J., concurring); Butcher v. Wendt, 975 F.3d 236, 245-52 (2d Cir. 2020) (Menashi, J., concurring in part); cf. Stillman, supra, at 512-33 (arguing the exercise of hypothetical statutory jurisdiction is unconstitutional).

During the Supreme Court's last term, three justices would have granted certiorari to resolve the "entrenched Circuit split" regarding the continuing use of hypothetical jurisdiction and

---

statutory subject-matter jurisdiction. See Butcher v. Wendt, 975 F.3d 236, 242-44 (2d Cir. 2020); Jordon v. Att'y Gen. of the U.S., 424 F.3d 320, 325 n.8 (3d Cir. 2005); Khodr v. Holder, 531 Fed. App'x 660, 664 n.4 (6th Cir. 2013); Lukowski v. INS, 279 F.3d 644, 647 n.1 (8th Cir. 2002); NLRB v. Barstow Cmty. Hosp.-Operated by Cmty. Health Sys., Inc., 474 Fed. App'x 497, 499 (9th Cir. 2012); Yancey v. Thomas, 441 Fed. App'x 552, 555 n.1 (10th Cir. 2011); Kramer v. Gates, 481 F.3d 788, 791 (D.C. Cir. 2007); Minesen Co. v. McHugh, 671 F.3d 1332, 1337 (Fed. Cir. 2012).

stated that "the lower courts' distinction between 'statutory jurisdiction' and 'Article III' jurisdiction seems untenable." Waleski v. Montgomery, McCracken, Walker & Rhoads, LLP, 143 S. Ct. 2027, 2027 (2023) (Thomas, J., dissenting). They reiterated that, "[t]he jurisdiction of federal courts is limited both by the bounds of the 'judicial power' as articulated in Article III, § 2, and by the extent to which Congress has vested that power in the lower courts as required by Article III, § 1." Id. (internal quotation marks and citation omitted). The justices argued that although assuming statutory jurisdiction may sometimes be efficient, that is not enough justification for a court to forego examining its jurisdiction. See id. at 2028. "Although [s]ome cases might cry out for decision on the merits, and sometimes it is convenient to assume away difficult jurisdictional questions to decide a case on easier merits grounds, courts' threshold duty to examine [their] own jurisdiction is no less obligatory in such cases." Id. (internal quotation marks and citation omitted). The three justices underscored that "[m]uch more than legal niceties are at stake here." Id. (quoting Steel Co., 523 U.S. at 101-02). "For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." Id.

Because the continuing currency of the hypothetical jurisdiction doctrine, even in its present form, appears to offend

separation-of-powers principles, I would resolve the doubts over the Court's jurisdiction before addressing the merits of the appeal and, should those doubts prove irreducible, would dismiss the appeal for lack of jurisdiction.